Plaintiff's automobile was badly injured when struck by a northbound freight train of the Missouri Pacific Railroad Company, in the Village of Clarks, Caldwell Parish, Louisiana, while it was stalled on the north side of the highway with its rear end a foot or two east of the east rail of the track. He sued to recover the amount allegedly *Page 736 
necessary to restore the car to its former condition and for an amount to indemnify him for the loss of its use until it was again put in running condition. Guy A. Thompson, trustee in bankruptcy of the Railroad company was impleaded as defendant.
The accident occurred about the hour of 1:45 A.M., November 17, 1945. The car had been entrusted by plaintiff to his son, James W. Cruse, to be used for his own pleasure the night of the occurrence. The son had as his companion during the night, among others, a young man named Troy L. Kelly, who lived in Clarks. After completing the night's activities the son drove the companion to his home in Clarks and left him there. He then started back to his own home. The route carried him easterly over defendant's track. He testified that he was blinded by the lights of another car, approaching the crossing from the south, which forced him to pull his own car so far to his left that it ran upon a post in a guard rail along the north side of the road, and became disabled. Its rear end, as said before, barely cleared the east rail. It seems that the battery connections were injured to such extent as to leave the car without the necessary power to back up from the post. Discovering this situation, plaintiff's son hastened back to the home of his companion who joined him in a physical effort to dislodge the car but they were unsuccessful. After the lapse of about fifteen minutes they heard the whistle of the freight train quite a distance south of them. The two boys then ran about a hundred yards down the track in the hope of being able to flag the train. They struck matches and waved their hands. Their efforts were futile. The train passed the crossing and the accident happened.
The following acts of negligence are charged to the operatives of the train, alleged to be the proximate cause of the accident, to-wit:
That the night was clear and had they maintained proper lookout they could or should have seen or did see the burning head and tail lights of the disabled automobile, and could or should have seen the two boys in the middle of the track waving their hands and striking matches in the effort to flag the train in time to have brought it to a stop before the accident; that defendant failed in its legal duty to maintain said crossing in a safe condition for automobile traffic; and but for this, the car would not have stalled. Act No. 157 of 1910 and Act No. 132 of 1918 are cited to support this contention.
It is also alleged that said operatives knew that Clarks is a very active business center, through which daily passes a large amount of shipping and knowledge of these facts should have prompted them, while going through said village, to be unusually on the alert.
In addition to the foregoing bases on which plaintiff seeks recovery, in the alternative, he invokes the doctrine of the last clear chance.
Defendant denied that the accident occurred because of carelessness and/or negligence of its servants and representatives in charge of the train, and affirmatively alleges that said accident happened solely because of the negligence of plaintiff's son in that he carelessly drove the car into the post although he well knew the physical conditions of and about the crossing from having often driven over the same in automobiles. Defendant also denied that there were any extraordinary conditions about the crossing and denied that it failed to maintain same in safe traveling condition.
Further pleading, defendant avers that the train was being competently operated and was traveling at thirty miles per hour, a very reasonable speed; that its headlights were burning brightly and in accordance with law; that the engineer saw a couple of men on the track when he was just south of the first crossing below Clarks, and kept his eyes glued on them from that time on; that when about eight hundred feet or nine hundred feet south of them, he realized that they were trying to signal the train to stop; that while keeping his eyes intently on the men he did not see and could not have seen the stalled automobile until his train was within four hundred or five hundred feet of it, at which *Page 737 
time the air brakes were applied as in emergency, but that because of the weight of the train and its speed it was impossible to stop it in less than twelve hundred feet.
Plaintiff prevailed below and was favored with judgment for $720. Defendant appealed to this court. The trial judge gave written reasons for the judgment.
[1] The surface of the crossing is about on a level with the surrounding area. The road, after passing over the track, turns northerly. The guard rail referred to was erected many years ago by the Louisiana Central Lumber Company, owner of nearly all the land, buildings and two saw mills in Clarks, mainly as a protection against its own vehicles going into an adjoining ditch. Everyone who motored in Clarks, including plaintiff and his son, knew it was there. The Department of Highways of the State registered no objection to it. To drive into the post plaintiff's son had to abandon his side of the road. He excused himself for so doing because of the lights of another car that came from the south. It was no part of defendant's legal duty to maintain this privately owned guard rail. It was not a trap, menace or hazard to traffic.
We perceive no merit in this contention of plaintiff. It is not really urged so seriously as is done with respect to the other points in the case. In addition to all of this, accepting plaintiff's son's version of the facts, it appears clear that the action of the driver of the other car was the real cause for him running into the post, and doubtless but for this he would have successfully cleared the crossing.
The case turns upon whether the engineer saw or should have seen the stalled car in time to stop the train prior to injuring it.
The train consisted of eighty heavily loaded cars. It was traveling at a speed of thirty miles per hour when the engineer realized that two men were on the track trying to flag him. This was not an excessive speed, all things considered. It was making about twenty miles per hour when it passed the crossing. The testimony is conclusive that this heavy train going at thirty miles per hour could not be stopped in a distance less than fourteen hundred feet. This is demonstrated clearly in the present case. Something in excess of fourteen hundred feet was covered from the time the brakes took effect until the train stopped.
About three thousand feet south of the crossing in question, defendant's track curves. About eighteen hundred feet south of this crossing there is another crossing at which the engineer gave the customary whistle signal. His testimony does not in the whole track defendant's answer. He testified that when the locomotive was at or near the lower crossing he saw and recognized the boys as such, but did not observe that they were waving their arms, and when he had traveled about an additional eight hundred feet he applied the brakes as in emergency and after going about one hundred seventy-five feet farther, he saw the stalled car.
Observing the young men on the track, apparently in possession of their mental and physical faculties, was not sufficient to devolve upon the engineer the duty to slow down his train or stop it. It is conceivable, in fact, true, that people, out of fun or thoughtlessness, do carelessly go upon railway tracks in front of moving trains and remain there until the locomotive is near them, and then jump off. This has been shown to be true in other cases before this court. If an engineer was required to reduce the speed of or to stop his train under such circumstances, it is obvious that schedules could not well be observed and the danger from train collision would be enhanced.
The engineer testified that he did not see the light from the matches struck by the boys. The brilliance of the train's headlights militated against him doing so. Naturally, as testified by him, after seeing the boys on the track his vision was focused upon them. He was wondering if they would get off the track before being run over. He continued to watch them until the train was too near the crossing to be stopped before reaching it. It was only necessary that he have done this for a few seconds in order to reduce the distance *Page 738 
from, the upper crossing to less than fourteen hundred feet. He must have been around nine hundred feet from the crossing as testified by him, when the brakes took effect because the train finally stopped five hundred twenty feet above it.
[2] The measure of an engineer's duty, after recognizing adults upon or near the track in advance of his train, was quite extensively discussed by this court in Johnson v. Texas Pacific Railway Company, reported in 16 La. App. 464, 133 So. 517. Many authorities are therein cited to support the applicable rule of law laid down in 52 Corpus Juris., p. 604, § 2159(4), which we, in part, quote:
"It is a well settled rule that, where the railroad employees in charge of a train see a person on or near the tracks in advance of the train, unless they know or can see from his condition, or his conduct, or from the surrounding circumstances that he will not or cannot retire to a place of safety in time to prevent an accident, they have a, right to presume that such person is of sound mind and good hearing and eyesight, and that such person will make a reasonable and proper use of his senses and where the proper alarm signal or warning, as by bell or whistle, is given to him of the approaching train, they have a right to act on the assumption that he will hear and heed the warning when given, and will retire to, or remain in, a place of safety in time to prevent injury from the approaching train of which he has knowledge or of which, by the ordinary use of his senses, he should have knowledge. * * *"
The cases of Sorey v. Yazoo M. V. Railroad Co., 17 La. App. 538, 136 So. 155, and Trotter et al. v. Texas Pacific Railway Co., La. App., 14.6 So. 365, are also in point.
[3] It is appropriate here to discuss and apply the principle embodied in the foregoing quotation because if the engineer was justified in not applying the brakes until he did so, after recognizing the boys, obviously he should be excused for not having applied them in time to avoid injuring the car, which was not recognized by him as such until the brakes had already been applied. We do not believe the engineer should be condemned for not having recognized the distressed car before he says he did. There is no force in the contention that he should have seen the lights of the car in time to stop the train before colliding with it. The car's head lights were focused easterly from the track, and its tail lights were not visible for any great distance.
The established facts of the case preclude application of the last clear chance doctrine.
[4] After summarizing the pleadings and discussing the facts, the court said:
"Accordingly, the defendant was under the duty of operating the train in this instance at such a speed as to be able to bring it to a stop within the distance in which its operators, in the exercise of due care, should be able to see objects, such as persons and automobiles, in a position of peril in the path of the train."
We think this to be an incorrect statement of the law. This was a through train. The time was past midnight when, to knowledge of all, traffic on the highways and in villages is reduced to a minimum. The position of the boys, so far in advance of the train, when first seen by the engineer, was not one of peril. The rulestated by the court has peculiar application to automobiles.
For the reasons herein given, the judgment appealed from is annulled, reversed and set aside; and there is now judgment in defendant's favor, rejecting plaintiff's demand and dismissing his suit, all at his cost. *Page 739