JANVIER, Judge,
At about 2:00 a.m., on the morning of July 22, 1953, at a railroad crossing near Boutte, a sparsely settled neighborhood, some 18 or 20 miles west of New Orleans, a motor truck belonging to plaintiff, Jerry J. Ledet, stalled oh the main line track of defendant railroad company, and shortly thereafter was struck and demolished by a locomotive of defendant company which was pulling a string of 77 freight cars towards the City of New Orleans.
Alleging' that the cause of the accident was negligence on the part of the engineer operating the locomotive and that his truck, before its- destruction, was worth $1,650, Ledet brought this suit for that amount against the defendant company. He charged that the locomotive engineer was negligent in the following particulars; that he failed to have the locomotive under proper control; that he failed to maintain a proper lookout for vehicles which might be on the crossing; that he did not attempt to stop or failed to stop the locomotive although there was sufficient time and distance for such a stop after the presence of the truck on the track should have been discovered, and in that he failed to act “as a reasonable and prudent person” would have acted under the same or similar circumstances.
The defendant company denied that its engineer was in any way at fault. It averred that its locomotive and all of its-equipment were in “proper working order” ; that the locomotive’s headlight “was burning full candlepower,” and that both the engineer and the fireman were maintaining, a careful lookout; that its train was proceeding at a lawful and proper rate of speed, under proper control, and that the crossing signals were sounded; that the presence of the truck on the track was discovered as soon as it could have been discovered, and that the “brakes were immediately applied in emergency,” and it' avers that “the distance in which the truck could be and was seen was so short” that the train could not be stopped before striking the truck.
*605 In the alternative that it should appear that there was negligence on the part of any employee of defendant company, it was especially alleged that plaintiff was himself contributorily negligent in permitting his truck to remain “on the crossing over defendant’s track at a time when the darkness into which its dull silver color tended to merge would make it invisible to those in charge of approaching trains until they were too close to stop in time to avoid striking it.”
It was conceded that plaintiff’s truck was totally demolished and that the value thereof prior to the accident was $1,650.
There was judgment for plaintiff as prayed for, and defendant has appealed suspensively.
There is practically no dispute over the facts, and the matter was presented below and was argued before us almost entirely on the sole question of whether there was negligence in the engineer in operating the train at a speed which did not permit of its being stopped within the distance illuminated by the headlight of the locomotive.
It is true that there is a dispute over the question of whether the engineer was looking out and saw the, truck as soon as he should have seen it, and over the question of whether he applied the brakes as soon as they should have been applied after he saw the truck on the tracks ahead. But the evidence on these points is so conclusive that it may be said that there is no foundation for a dispute on these questions and that the record clearly establishes that the engineer saw the truck as soon as he should have seen it and that he applied his ■brakes in emergency immediately on becoming aware of the presence of the truck.
There is no dispute at all over certain facts. The locomotive was pulling a freight train which consisted of 60 loaded cars and 17 which were empty. The loaded cars contained freight weighing 3,450 tons. We mention this because we shall later refer to another train which was used in making certain tests and which was being pulled by- a locomotive identical with that involved in this accident and which train consisted of 85 cars of which 54 were loaded and 31 were empty and which contained freight weighing 3,475- tons.
The speed of the train when the engineer noticed the truck was 40 miles per hour. Forty-five miles per hour was the maximum permitted by the regulations of the defendant company and there is no contention that any statutory law, local or otherwise, required that the speed be less than the 40 miles per hour at which the train was being operated.
As the train approached the crossing there was a slight curve to the right. The arc of this curve was shown to be one degree, three minutes, thirty seconds. The train entered this curve at a point 1,500 feet from the crossing and when it reached a point 486 feet from the crossing it had completed the curve and from that point to the crossing the track was straight.
The engineer says that as he reached a point near the crossing whistle sign — this is shown to be 2,048 feet from the crossing — he began sounding the crossing signal which consists of two long blasts of the whistle, then one short blast, then one long blast, and he says that just before completing the last long blast he noticed the truck on the crossing and that he immediately closed the throttle and applied the brakes in emergency. He says that when he first saw the truck the locomotive was about 600 feet from the crossing and that the train was brought to a stop when the locomotive was about 300 or 400 feet beyond the crossing after having struck and demolished the truck. He added that at a speed of 40 miles per hour with a train such as he was pulling at that time and under those conditions, a distance of about 1,200 feet is required to stop in emergency.
An effort was made by counsel for plaintiff to show that the train could have stopped more quickly by what counsel referred to as “flat spotting.” We understand this to mean the application of brakes so firmly that all of the wheels, slide with a result *606 ing flat or worn spot on the lower side of each wheel. The testimony of the experts and of the engineer • shows that beyond a doubt a quicker stop is effected by applying the brakes in emergency which means to apply them firmly and at intervals to release them slightly and then to apply them again.
As we have said, the evidence convinces us that there is no doubt at all that a quicker stop was effected by the method adopted by the engineer than could have been effected by “flat spotting” the wheels.
Mr. E. D. Keen, admittedly an expert traveling engineer, says that as a result of tests with a similar locomotive, pulling a similar'train, he .determined that it would require a distance of 1,300 to 1,400 feet to effect an emergency stop.
The locomotive headlight is shown to have been in perfect condition and its beam projected light sufficiently to disclose an object on the track 900 feet ahead of it.The record shows that the regulations of the Interstate Commerce Commission require that such a headlight must be effective for a distance of 800 feet; so that this headlight complied fully with the requirements of the Interstate Commerce Commission.
Further tests made at the crossing disclosed that, as a locomotive approaches from the west, because of the curve of the track, which contour the headlight does not follow, the crossing is not illuminated by the headlight until the locomotive reaches a point 760 feet from the crossing. At that •distance the headlight illuminates the crossing sufficiently for an automobile truck to be seen “but not identified.” -At. 660 feet •such an object as an automobile can be identified.
The fireman, who was on the left side ■of the locomotive, says that he was looking out; that he saw the truck for the first time when the locomotive was about 500 feet from it, and that the engineer applied the brakes immediately in emergency.
There is not one syllable of evidence which tends to controvert any of these figures except that counsel for plaintiff assert that the testimony of the engineer indicates that he does not know how far he was from the crossing when he first saw the truck nor how far he was when he first applied the brakes. The testimony of the engineer as to when the whistle was blown and when the brakes were applied is corroborated by the fireman.
The engineer says:
“I sounded the usual crossing signal which is two long and a short and a long. Before I could complete the last long sound of the whistle, I saw the bus and I immediately closed the throttle and put the brakes in emergency and started -blowing with the warning signal which is short- successive warning signals.”
Since the crossing whistle sign is slightly more than 2,000 feet from the crossing and since the engineer says that he started to blow the crossing whistle when he reached that sign and that he saw the truck just before he completed the last long : blast, counsel for plaintiff argue that the locomotive must have been more than 600 feet from the crossing when the truck was seen by the engineer. This argument overlooks the fact that the time required for the blowing of four blasts, three of which are quite long, was certainly several seconds. And it further overlooks the positive testimony of both the engineer and the fireman that they both were looking out ahead and that they both saw the truck at about the same distance, and that the brakes were immediately applied. And the engineer says that when he applied the brakes the locomotive was about.600 feet from the crossing. The fireman says that when the brakes were applied the locomotive was 500 feet feet from the crossing.
The slight discrepancies in the testimony of these two witnesses rather evidences truth and does not tend to weaken the force of either.
The record leaves no doubt that the train was in proper operating ■ condition; that its speed was not violative of any legal re *607 quirement nor of any regulation of the company, that its headlight was burning properly and that it complied with all legal requirements.
The question which is then presented is solely one of law. Was it negligence to operate such a train at such a speed at such a crossing? Counsel 'for the plaintiff and the Judge of the District Court say that it was. Counsel for defendant say that it was not. We think that the all important fact upon which this question depends is the character of the surrounding neighborhood. A speed which may be considered as evidence of negligence in one locality will be considered entirely reasonable in another. While there is little testimony as to the character of the neighborhood in which this crossing' is located, it is shown that it is about twelve miles from the Avondale yards of the defendant and other railroads, which yards are on the west bank of the Mississippi River, and the photographs of the crossing show that it is in a very sparsely settled neighborhood and that, because of its location it may properly be termed an ordinary country crossing. It must also be remembered that the accident occurred at two o’clock in the morning.
We find that this is an ordinary blacktopped country crossing, which -is protected by automatic signals which were in good working condition at the time at which the accident occurred.
Plaintiff says that he knew he was approaching the crossing and the record indicates that while the truck was “stalled” and stationary on the crossing the train approached and that this started the operation of the crossing signals.
In reaching the conclusion that it was negligence for the defendant company to permit such a train to be operated at this crossing at a speed so great that it could not be stopped within the range illuminated by the headlight of the locomotive, the Judge of the District Court relied almost entirely on his interpretation of what the Supreme Court said in Blackburn v. Louisiana Ry. & Nav. Co., 144 La. 520, 80 So. 708, 711.
While it is true that in that decision the Supreme Court used language'which may be interpreted as indicating that under all circumstances trains must be operated at speeds which will permit of their being stopped within the distance illuminated by their headlights, we do not think that the Court laid down or intended to lay down any such rule. In that case, the man, who was struck- on the track, was seated on a cross-tie of the, railroad company about 100 feet from the depot in Colfax, Louisiana,. obviously within the actual limits of the town. The Supreme Court said:
“ * * * It will not do for railroad companies to run their trains into and through thickly populated towns and cities, by depots and places where people are known to frequent, at such high rates of speed, their employes not seeing that which, by the exercise of ordinary care, they should see, and then be permitted to escape liability because of the inability of such employés to stop the trains when the danger is actually discovered. * * * ”
This language can by no means be interpreted as meaning that in country neighborhoods, in sparsely settled areas, all trains must be operated at -speeds which will permit of their being stopped within the distance illuminated by their headlights. Furthermore, in the Blackburn case, the Court referred to other cases in which it had been held that there was no liability and distinguished those cases by saying that in them the accidents had occurred “in obscure places where they were not to be expected, or in places on the tracks where the enginemen were not required to use anything more than ordinary care.”
According to our interpretation the Blackburn case holds no more than that in running through thickly settled neighborhoods in towns or in other places where persons or vehicles may be expected to congregate, trains must be operated at speeds which will permit of their being stopped without injuring such persons, but that in sparsely settled districts may be operated at any speeds consistent with the safety of the trains.
*608 That the Blackburn .case has' not been interpreted by the Courts of Appeal of this State as requiring’ that in all instances the speeds must be so reduced is evidenced by the fact that in a tremendous number of cases the Courts of Appeal have not applied the rule as it is contended for by counsel- for plaintiff.
In Pinckley v. Texas & P. Ry. Co., 165 So. 504, 506, the Court of Appeal for the Second Circuit, referring to several cases, including the Blackburn case, said:
“The facts of all these cases are easily differentiated from those of the case at bar”,
and added:
“It is true that the court held in the Blackburn Case that if the train was being run at night at such, a rate of speed that it could not be stopped within the distance objects on the track could be seen, such was or could have been the proximate cause of the accident. However, while the rule here laid down may have had application to the peculiar facts of that case, it'does not have general application. To apply it to railroads generally would materially impair the efficiency of the operation of their passenger trains and work inconvenience and hardship on the general public. Del Buono v. Illinois Cent. Ry. Co., 12 La.App. 35, 124 So. 694; Mongogna v. Illinois Cent. Ry. Co., 115 La. 597, 39 So. 699; Boyd v. Kansas City S. & G. Ry. Co. (La.App.) 147 So. 100; Campbell & Co. v. Texas & P. Ry. Co. (La.App.) 152 So. 351; Jeter v. Texas & P. Ry. Co. (La.App.) 149 So. 144.”
Furthermore, if the interpretation contended for by counsel for plaintiff should be put on the opinion of the Supreme Court in the Blackburn case, it would be contrary to the established jurisprudence elsewhere and in this State. While it may be true that in no one of the cases cited by defendant was a writ of certiorari applied for, it seems quite remarkable that counsel in those various cases did not apply for writs if the decision in the Blackburn .case justified the conclusion that in each one of those many cases an incorrect conclusion had been arrived at.
Then too, as we have said, if the Black-bum decision is to be so interpreted, it is out of harmony with the well established jurisprudence in other jurisdictions, as well as with other earlier holdings of our own Supreme Court.
In Vincent v. Morgan’s Louisiana & Texas Railroad & Steamship Co., 48 La. Ann. 933, 20 So. 207, 209, the Supreme Court said:
“It has been said in other jurisdictions that trains must be run with speed on dark nights and on misty days, and that doing so raises no inference of negligence in the absence of special facts going to call for particular precaution. [Omaha & R. V.] R. R. Co. v. Wright, [47 Neb. 886] 66 N.W. 842. Trains are run by schedule, one train conforming itself to the movements of the others; and it would be a dangerous rule to establish that weather conditions in one particular neighborhood should control and regulate the speed of the trains in a special vicinity. It is not shown that the lane at Olivier crossing is a much frequented crossing, or that there were grounds for sup'posing that persons proposing to cross there would not be governed by ordinary rules of caution and prudence.”
In Davis v. Alexandria & W. Ry. Co., 152 La. 898, 94 So. 436, 437, the Supreme Court said:
“ * * * In the open country any rate of speed consistent with the safety of train was proper and legitimate. Houston v. V[icksburg] S. & P. Ry. Co., 39 La.Ann. 796, 2 So. 562.”
See Cheek v. Thompson, 5 Cir., 140 F.2d 186.
As we have already said it is obvious that the Blackburn decision has not been so interpreted in a large number of decisions of all three Courts of Appeal of Louisiana, all *609 of which have been rendered since the decision in the Blackburn case. No one of ’the three Courts of Appeal has given to that decision the interpretation contended for by counsel for plaintiff. This is recognized by the Judge a quo, who, in citing nine of those decisions, recognized that each is a holding “to the contrary”. In his reasons for judgment he refused to follow the holdings in any one of those nine cases, saying that “in none of those cases were writs- of certiorari applied for.”
Let us examine and discuss some of the cases in which in unequivocal language it was held
“that the law does not require trains to be operated at a speed permitting them to be stopped within the range of vision of its operators. * * !|! ”
See Homeland Ins. Co. v. Thompson, La. App., 12 So.2d 62, 64.
In Del Buono v. Illinois Cent. R. Co., 12 La.App. 35, 124 So. 694, 695, we stated that the plaintiff contended that there was liability because
“the range of the headlights was so obstructed by the terrific downpour that the engineer could see only a short distance ahead, and that the speed was such that the train could not be stopped within the distance illuminated by the headlight. In other words, it is contended that under all circumstances and in all localities a locomotive must be operated only at such speed as will permit of its being brought to a complete stop within the distance illuminated by its headlight. * * * ”
We found that there was no liability, saying:
“To require of trains in the open country that they shall at all times operate at such speed as will permit of their being stopped within the distance illuminated by their headlights would seriously interfere with train schedules, in which the general public is as much interested as are railroad companies. * * * ”
In Jeter v. Texas & P. Ry. Co., 149 So. 144, 145, the Court of Appeal for the Second Cirucit said:
“It is too well settled to require citation that the law does not require trains to be operated at a speed permitting them to .be stopped within the range of vision of its operators.”
In Edwards v. Thompson, 2 So.2d 493, 495, the Court of Appeal for the Second Circuit noted a fact which is also noted in the case at bar as the reason why the engineer could not see the truck sooner than he did, i. e., that a locomotive headlight beam will not follow the curve of the track but projects forward. In that case the accident resulted from the fact that at four o’clock in the morning two mules were killed by a train because, as a result of a curve, the headlight of the locomotive did not illuminate the mules for a distance sufficient to permit the stopping of the train. The Court said:
“ * * * To hold defendant liable for the value of the mules, we would have to hold that it was negligence for the curve to be in the track in this particular place. We are not asked to do this, nor would it be reasonable to do so. * " * *
“Trains, of necessity, must operate on schedules.. These schedules require that they run at definite speed in order to cover certain distances within fixed periods. To accomplish this speed cannot be reduced because of rain, fog, smoke or other abnormal atmospheric conditions, nor for curves; nor are they required to operate at such rate of speed that they may be stopped within the distance illumined by their headlights as is required of automobiles.”
In Moody v. Texas & Pacific Ry. Co., 37 So.2d 346, 347, the Court of Appeal for the Second Circuit considered a case in which cattle were killed by trains of the defendant company. It was contended that
“the trains were operated at a speed so great that they could not be stopped *610 within the distance the engineers could see”.
The Court said:
“No law of this state forbids a train to be operated at a speed so rapid that it cannot be stopped within the distance the engineer can see. Such a rule would require trains to be stopped entirely or their speed reduced so materially in case of heavy fog, smoke or dust storms that schedules could not be observed. The same would be true as regards passenger trains that travel rapidly at night, because they cannot be stopped within the distance the engineer is able to see down the track even with the aid of powerful headlights. ¡Of course, in the day time, when the weather is fair, any train may be stopped within the distance an engineer, having good eyesight, can see. The negative of plaintiff’s contention on this phase of the case is well established by the jurisprudence of this state. * * * ”
In Neal v. Louisiana & Arkansas Ry. Co., La.App., 17 So.2d 374, 376, the litigation resulted from the killing by a train of a young man who lay in a drunken stupor on the track of the defendant railroad. The Court found that the accident had occurred in a sparsely settled area and, after stating that the only possible basis for a claim might be the fact that the operators of the train had not discovered the man as soon as they should have, said:
“As a matter of fact, we find that the vision of the engineer and fireman was limited and restricted to distances much less than even the 750 or 800 feet illuminated .by the focal beam of the locomotive’s headlights. The engineer, leaning out of his cab on the curve passing the depot had a maximum vision of less than 200 feet, and at the point where the track became straight, and when his vision along the track would have been normal, the locomotive at that time was within 200 to 500 feet of any point lying within the stretch of track upon which the accident must have taken place. The vision of the fireman on the opposite side of the cab was limited by freight cars standing on the passing track, and further was limited by the physical facts of a dusky, murky light and weather condition. It is also true that the beam of the headlight in making the curve, and before reaching the straight track, was sweeping in an arc outside of the far rail of the track from the position of the fireman, and at the time that the track straightened and the beam became fixed, he, too, was prevented from seeing any object upon the track at or near the location of the accident in time to have warned his engineer.”
In Bahry v. Illinois Cent. Ry. Co., 13 So.2d 78, 80, the Court of Appeal for the First Circuit made the following statement:
“Of course, if the track had been straight, the engineer, according to his own statement, should have seen the stalled car in ample time to stop the train, but, on account of the curve in the track, he saw the car just as soon as it was possible for him to see it. * * *»
And then held that
“a curve in the railroad track which prevented the beam of the headlight of the train from following the track, making it impossible for the engineer to see a person on the track for a sufficient distance to stop the train before striking him, did not require the trainmen to operate the train at such a speed that it could be stopped within the range of the headlights.”
In Foster v. Texas & P. Ry. Co., 5 La. App. 601, the accident occured near the railroad station in a village in the Parish of St. Landry. The Court held that there was no liability and said:
“Of course, plaintiff does not contend that a passenger train under these weather conditions should only be run at such speed as would enable the engineer, on seeing obstructions on the *611 track, to stop in time to avoid running into them, * *
In Hall v. Kansas City Southern Ry., 14 So.2d 485, 487, the Court of Appeal for the First Circuit said:
“The evidence shows that it required a distance of 1,200 to 1,400 feet to stop this particular train going at a speed of about 35 miles per hour. The train was brought to a stop within about that distance and after it had gone several hundred feet from where the deceased was struck. The rules of the Interstate Commerce Commission require that locomotives be equipped with a headlight which will enable the engineer in the cab at night, in a clear atmosphere, to see an object the size of a man standing upright on the track a distance of at least 800 feet ahead. The track at the point of the accident is straight for several miles in each direction. Considering that the vision was somewhat restricted by the atmospheric conditions, we cannot say that the trainmen were negligent in failing to see the deceased on the track at a greater distance than they did see him. Conceding that they should have seen and recognized him as a human being at a distance of 1,000 to 1,200 feet which appears to be the maximum distance a person can be seen on a clear night, the train could not have been stopped within that distance and the accident prevented. * * * ”
In Griffin v. Thompson, 11 So.2d 114, 117, the Court of Appeal for the First Circuit said:
“ * * * this train was in a curve and * * * the men who were run into were sitting at a distance of some 75 feet outside of the curve. Naturally as the engine was rounding the curve, its headlight was following the contour of the curve itself and it would seem to be a physical impossibility for the beams to have projected around and beyond the curve and shine on the two men. * * * ”
The Court then said:
“ * * * as the two men were sitting on the track at a distance of only 75 feet from that point, that is how far they were from them when the trainmen first saw them. * * * ”
The Court then held that, in these circumstances, there was no negligence in operating the train at a speed which did not permit of its being stopped within the distance which remained after the presence of the men was discovered. Application for a writ of certiorari was made to the Supreme Court and the application was refused.
In Miller v. Baldwin, 178 So. 717, 721, the Court of Appeal for the First Circuit entered into a very interesting discussion of the several types of cases in which persons on railroad tracks are injured and said that where such an accident occurs in a sparsely settled neighborhood there is no liability.
“The second class of cases is where a person goes to sleep on the track, or gets intoxicated and lies down on the track, thus changing his active negligence to a kind of passive negligence, and the locality where he thus places himself in a place of danger on the track is a rural section or sparsely settled community, and at a point where the operatives of the train could not be reasonably expected to find such a person on the track, the engineer is not required to keep the train under such control so as to stop within the range of the headlights, but may take it for granted that there is no human obstruction on the track. This class of cases is illustrated by a large number of cases in our reports, many of which are cited by counsel for defendant and relied on in this case, the most pertinent being: Rogers v. Louisiana Ry. & Nav. Co., 143 La. 58, 78 So. 237; Tyer v. Gulf, C. & S. F. Ry. Co., 143 La. 177, 178, 78 So. 438; Trotter v. Texas & P. Ry. Co., La.App., 146 So. 365; Pinckley v. Texas & P. Ry. Co., La.App., 165 So. 504.”
*612 On Cruse v. Thompson, La.App., 36 So.2d 735, 738, an automobile had “stalled” on a railway crossing. The District Court held the railroad liable, saying:
“ ‘Accordingly, the defendant was under the duty of operating the train in this instance at such a speed as to be able to bring it to a stop within the distance in which its operators, in the exercise of due care, should be able to see objects, such as persons and automobiles, in a position of peril in the path of the train.’ ”
On appeal the Court of Appeal for the Second Circuit said:
“We think this to be an incorrect statement of the law. This was a through train. The time was past midnight when, to knowledge of all, traffic on the highways and in villages is reduced to a minimum. The position of the boys, so far in advance of the train, when first seen by the engineer, was not one of peril. The rule stated by the court has peculiar application to automobiles.”.
In Guidry v. Texas & N. O. R. Co., 56 So. 2d 611, 613, the Court of Appeal for the First Circuit discussed the' obligations of the operators of trains proceeding through fog. The plaintiff apparently conceded that the Ordinary rule is that a train need not be operated at a speed which will permit of its being stopped within the range of the vision of the engineer, but contended that: “the presence of the fog removes this case from the general rule and consequently this speed constituted an act of negligence under the circumstances.” The Court- answered this contention as follows:
“* * * We cannot agree with this contention since this argument was forwarded before this Court in Homeland Insurance Co. v. Thompson, La. App., 12 So.2d 62, 64, and we there decided there was no rule of law requiring trains to be driven at a rate of speed so they could be stopped within the range of the operator’s vision. Further, that a railroad company was not required to slow its trains during rainy or cloudy weather when traveling through a sparsely settled community. * * *”
In Royal v. Kansas City Southern Railway Company, 75 So.2d 705, 710, the Court of Appeal for the Second Circuit considered a case in which a man was killed as a result of lying prostrate and helpless in an intoxicated condition at Gandy, a settlement in Sabine Parish, Louisiana. The train was traveling at a speed of between 50 and 60 miles an hour. At about 2:45 o’clock in the morning the man was struck and killed by the train. The Court found that as a result of fog the operators of the train could not see the man on the track in time to bring the train to a stop. The Court said that under the circumstances “the locomotive engineer was under no legal duty when he approached Gandy on the morning of June 29, 1946, to reduce the speed of his'train.”
It is argued that no distinction should be made between the obligations of an operator of an automobile on a public road or highway and the obligation of an engineer operating a train on the private right of way of the 'railroad, and that since there is a well established rule that an operator of an automobile must run it at a speed which will permit of its being stopped within the distance which is illuminated .by its headlights, this same rule should be applied in the case of an engineer. We do not think that the situations are sufficiently similar to justify the conclusion that the same rule should be applied. An automobile can be brought to a stop in a distance which is much more closely related to the distance which its lights illuminate and consequently that it must be stopped within that distance does not seriously interfere with its normal use. In the case of a train, it is shown that a tremendous distance is required for a stop and in fact, it is shown here that at the speed at which this train was being operated, a distance of 1,200 to 1,400 feet would be required. If the speed of such a train must be reduced at every curve and at approaching every railroad crossing, or whenever there is fog or heavy rain, no schedules could be maintained *613 either by passenger trains or by freight. trains.
Then too a train operates on its private right of way and in the open country, and only at intervals is required to cross areas in which it may encounter members of the general public. In cities or in other congested areas where there is danger that unexpected persons or vehicles or other property may be on the track there is an obligation to reduce speed. This was recognized in the Blackburn case. However, normally in country 'areas such as that with which we are concerned,' such a requirement would place on railroads an insurmountable obstacle to their proper operation.
That there should be a distinction between the obligation placed on the operator of an automobile and that placed on the operator1 of a train was recognized in Homeland Insurance Company v. Thompson, supra, in which the Court said [12 So.2d 64]:
“The rule of law which requires an automobile to be driven at such a rate of speed so as to be stopped within the range of the operator’s vision does not apply to operators of a train on a railroad. The train of the defendant company was being, operated on its own property; it could not be so easily stopped, nor could it be veered in any other direction. To require a train to be so operated in a sparsely settled community and at a time when traffic is not usually present at such a speed as to permit its being stopped within the distance an object may be seen on the track during a heavy fog would seriously interfere with train schedules in which the public is as much interested as the railroad company.”
We do not wish to be understood as holding that the distinction between the obligation as to speed of the automobile operator and the obligation of the train operator rests upon the single fact that, in the case of the latter, the operation takes place on the private right of way of the railroad company. The mere ownership of the right of way is not the fact which, in the case of the locomotive operator, justifies his operation-of the train at a speed which does not permit of its being stopped within the distance illuminated,, by its headlight. The difference lies in the fact that, because the railroad right of way is privately owned, there is much less danger that some one or some article of property will be caught helplessly upon the track. On* the public highway there are certain to be other vehicles behind and before each and every other car, and consequently there is more than a possibility — in fact, there is probability and almost a certainty, that continuously situations will arise which will require the stopping or the slowing down of every motor vehicle on the road. Consequently each must be operated at such speed as will permit of compliance by its driver with the rule which requires him to stop before striking a vehicle which may be ahead of1 him ’ on the road.
This is not so on the right of way of a ' railroad. Such possibilities as caused the accident in this case occur only at crossings r and only very rarely, since they result' either from the intoxication of the man who ‘ is helpless on the track or from the fact • that the automobile, because of its own defects, has stalled upon the track. Such crossings are usually protected by automatic signals of various kinds and, as a result, all persons who find it necessary to cross the tracks are able to anticipate the appearance of trains and to -remain in a position of safety except in the extremely rare cases where their vehicles cannot be removed from positions of danger. It is only in these extremely rare situations that a slowing down of the speed of the train would be of importance, and these occasions are so rare that the general necessity for speed overrides the very infrequent necessity for reduction of speed at these isolated crossings.
In reaching the conclusion that it was not negligence on the part of the engineer to operate the train at a speed which would not permit of its being stopped, we have *614 not overlooked the suggestion of counsel for plaintiff that instead of an inanimate truck of comparatively small value, it might have been 'a bus full of school children which was on the crossing and that had it been such a bus the death of many of the children might have resulted.
We have given thought to the question of whether, in such an overwhelming tragedy, we could permit ourselves to accept the view which we now entertain, but we cannot see that the legal situation would have been changed in the slightest had there been a human injury or death. If it was not negligence to so operate the train where there was involved a truck of small economic value, it cannot be said that it would have been negligence to have operated the train at the same speed in a case in which a vehicle loaded with children might have been involved. We concede, of course, that the saving or protection of one human life is of more importance than the maintenance of schedules of trains, whether they be freight or passenger, and we concede too that where there is a reasonably to be expected danger as a result of the speed of even one train, and where possibly there is a reasonable possibility that only one person may be injured or killed, the speed of all trains should be sufficiently reduced to eliminate all possible danger.
But the establishment of a proper rule in such cases cannot result from the facts in one particular case. So seldom is there such an occurrence as that which caused this catastrophe that it is necessary to the economy of the country as a whole that that slight danger be overriden by the general welfare and that trains, be they freight or passenger, be permitted to maintain schedules which will permit of their complying with the requirements of passengers and of industry that freight be delivered promptly.
Therefore where there is a reasonable expectation that persons may congregate or that vehicles may frequently cross the tracks or that possibly vehicles may stall on the tracks, we readily agree that speeds should be reduced so that such accidents would be avoided. But we also feel that where there is so little reason to expect such an occurrence as this, the necessities of general commerce require that the slight danger should not prevent the operation of trains at proper and necessary speeds.
On each railroad there are innumerable curves. There are locations in which, because of such curves, intervening trees or shrubbery may prevent the operators of trains from seeing very far ahead; fogs and rains occur which interfere with the view. Where these situations are found in sparsely settled neighborhoods there is no requirement that the speeds of the trains be so reduced as to permit of their being stopped within the range of the locomotive’s headlights.
It is interesting to note that in this particular case plaintiff knew that his automobile was defective. He said that on the night before: “It gave me trouble. I am not too much of a mechanic. I monkeyed with the wires and it looked like it went off ‡ ‡ ft
Our conclusion is that however unfortunate the occurrence was, it did not result from negligence on the part of the operators of the train, nor from defects in the brakes, headlight, or other equipment.
Consequently the judgment appealed from is annulled, avoided and reversed and plaintiff’s suit is dismissed at his cost.
Reversed.