JANVIER, Judge.
Plaintiffs-appellees are a brother and four sisters of Clement J. Zeringue, who was killed at about 9:35 o’clock at night on May 10, 1964, when the automobile which he was driving was struck and demolished by a diesel locomotive of Texas & Pacific Railway Company at a road crossing in the unincorporated settlement known as Luling, about 12 or 13 miles upriver, on the west bank of the Mississippi River.
The locomotive was being operated by the engineer, R. W. Waller. Plaintiffs brought this suit against both the railway company and Waller, alleging various acts of negligence on the part of Waller and making additional charges against the railway company which they aver rendered that particular crossing so dangerous that it constituted a trap, and that their brother could neither see nor hear the train as it approached.
They prayed for a lump sum judgment for $52,809.98 against both defendants and in favor of all five plaintiffs without setting forth any particular amount claimed by any one of them. The total amount claimed for the damages sustained by them is based on the loss of the love and affection of their brother, $2509.98 as the funeral and bui'ial expenses and $300.00 as the value of the destroyed automobile, which plaintiffs were permitted to claim by amendment at the trial below.
We find nothing in the record to show who paid the expenses, nor to whom the amount allowed for the value of the automobile would go.
*811 Defendants especially denied all charges of negligence, averred that the accident had resulted from negligence of Zeringue himself, or in the alternative, that it was his contributory negligence which caused the accident in that he attempted to negotiate the crossing when the train was approaching and when it was too close to his car.
The jury rendered a verdict for a lump sum of $27,809.98 in favor of all five plaintiffs without awarding any particular amount to any one of them. Since the funeral expenses amounted to $2509.98 and the total judgment was for $27,809.98, possibly the $25,000 balance of the judgment was intended to be divided into five parts, each, but we repeat that there is nothing in the record to indicate just how the judgment was to be divided. A judgment was rendered on this verdict, and the matter came before us on suspensive appeal by both defendants.
The charges against the defendants are that the proper warning signals were not given as the locomotive approached the crossing; that the train was being operated at too high a rate of speed; that the crossing was extremely dangerous for several reasons: (1) that the view of the driver of an automobile approaching the tracks as Zeringue approached it was obstructed by trees, grass and other shrubbery to such an extent that a driver could not see the approaching train until his car had reached a point only a few feet from the tracks; (2) that the crossing was highly elevated and that an automobile must negotiate a sharp rise before reaching the tracks; (3) that the surface of the roadway between the rails of each of the two tracks and between the two tracks was dangerous in that it was not properly surfaced; (4) that the speed of the train was excessive; and (5) that the proper crossing signs had not been erected by the railway to warn persons about to cross the tracks in that, although there were two tracks to be crossed, an inverted “T” sign, required by LSA-R.S. 45 :- 562, had not been erected in addition to the two other usual signs which faced Zeringue.
Were it not for the well established jurisprudence that the verdict of a jury, based on a determination of facts, should not be disturbed unless manifestly erroneous, we could not escape the conclusion that regardless of whether there was fault on the part of either of the defendants, Zeringue himself was at fault in attempting to cross the tracks when he should have noticed the brilliant headlight of the approaching locomotive, and should have realized that it was dangerous to attempt to cross.
The principal charge of fault over which there is a dispute is that the required crossing whistle signals were not given by the locomotive as it reached the point at which they should have commenced.
The plaintiffs aver that the proper whistle signals were not given. Several persons who reside in the neighborhood said that they heard only one whistle and that only a very short time before the crash. On the other hand, there are three witnesses for defendants who said that the required whistles were given when the train was at the proper distance from the crossing.
The witnesses for plaintiffs, who said that only one whistle was sounded and that only a short moment before the crash, all considerably weakened the probative force of their testimony, each stating that something else was occupying his or her attention, or that each was not absolutely certain as to the number nor the length of the blasts.
Harold Stewart, who said that he heard only one whistle, stated that he had a hearing difficulty that “stems from World War II,” but said that he could hear such sounds as whistles. He was reading a paper on which his attention was directed. He said that he was used to hearing trains and did not make it a point to listen to them.
Mrs. Dolores Alost said that she was looking at television and was busy sewing when she heard the whistle. She said that she did not pay- particular attention to *812 trains, that “I’m so used to hearing trains passing because I’ve.lived there ten years that I just don’t pay any attention. * * * I was sewing, my air conditioner was running, and I was watching TV * * * ” She was asked: How long was the blast ■of the horn”? and she said: “It wasn’t too long but I couldn’t tell you in seconds or .minutes how long. * * * ”
Mrs. Marilyn Fahrig was reading at the time and when asked whether she had heard two or three blasts, she said: “I read all the time,” and that she was very much interested in reading. She added: “ * * * I’ve become accustomed to the trains so I don’t pay any attention to trains. * * * ” She was asked whether she was prepared under oath to swear that there were not other whistles blown before the long one and she added: “No, I am not.”
The three witnesses, who testified on behalf of defendants that the regular signals were given, were the engineer Waller, the fireman Dean and Wade Quebedeaux, who was visiting friends who lived some 400 or 500 feet from the crossing and whose house was located about 250 or 300 feet from the tracks and a similar distance in a direct line from the road on which the automobile was traveling. The testimony of this witness is attacked on the ground that he was an employee of another railroad company and that, therefore, his testimony was biased. He is also criticized for the reason that, although he was visiting at the time in a home in which there were other people, he refused to give to the attorney for plaintiffs the names of those other people and said that he had been instructed not to give that information.
Another question is whether the view of Zeringue as he neared the tracks was so obstructed by trees, grass and shrubbery that he could not see the approaching locomotive until he was practically on the tracks. The testimony on this question is conflicting, but the conclusion is inescapable that, although there were trees which, though not on the right of way, had branches which overhung the right of way line about 10 or 15 feet, those obstructions to the view did not prevent Zeringue from having an unobstructed view to his right for a distance of-at least 1400 feet when he had reached a point at least 30 or 40 feet from the first of the tracks, which was not the track on which the train was approaching, and 40 or 50 feet from the main line on which the accident occurred.
The contention that there were trees, grass and other shrubbery, which was so high that it obstructed the Zeringue view, is not borne out by the record.
The contention that the roadway itself was so defectively surfaced that it could not be traversed with safety is, to say the least, not convincing.
It is true that shortly before the accident the railway had constructed a second track, which has been referred to, and that between the rails of that track the surfacing was not identical with the surface between the rails of the other track and between the two tracks, but the pictures which were taken on the day after the occurrence leave no doubt that the surface of the roadway was amply adequate and that this condition played no part in the ensuing tragedy.
The contention that the railway was so highly elevated and that the approach to it was so steep as to make it very dangerous is not convincing. Nor do we feel that there was anything unduly dangerous in the surface of the roadway.
As showing that the surface was so defective that automobiles could not easily and safely cross the tracks, plaintiffs place much reliance on the testimony of Edward A. Dufresne, Jr., Clerk of the District Court, who said that the crossing was very dangerous and that he had once had trouble going over the tracks. However, he said that on the night of the accident, as he was returning to his home from New Orleans, when he reached the crossing there were ten or eleven cars in a line ahead of him. Apparently they all crossed the tracks without *813 difficulty since he made no mention of any difficulty on that occasion.
Nor do the photographs show any unduly bad surfacing of the roadway, and that those photographs depicted the true scene is evident since counsel for plaintiffs made the statement that they were pleased when those photographs were introduced.
The charge that the rise in the roadway as it neared the tracks was so abrupt that it was dangerous is not substantiated. Mr. Dufresne, the Clerk of Court to whom we have referred, said: “The crossing is not really steep but it does have an incline, very high incline, sharp incline. I wouldn’t consider it steep.”
Mr. Earl Collier, the surveyor who testified on behalf of plaintiffs, saw the crossing the morning after the accident and about eighteen months later he made sketches using a scale of one inch to twenty feet. He said that from the normal elevation of the highway there was a rise to the track of about five feet. He stated that the break, meaning the start of the rise, was 20 feet from the rail. In other words, he said that there was a rise of almost five feet in that 20 feet. However, his sketch shows that the track itself was 14.87 feet above sea level, and he shows, too, the point at which the elevation above sea level was 9.77 feet. This would show a rise of 5.1 feet but the point at which the elevation was 9.77 feet was a little more than 80 feet from the track and not 20 feet as Mr. Collier testified. Thus, according to his sketch the rise of 5.1 feet was in a distance of more than 80 feet and not within a distance of 20 feet.
The only actual eye witness of the occurrence was Dean, the fireman of the locomotive. It is shown that in such locomotives the engineer sits on the right side and that, because of the very long front extension of the body of the locomotive, his view to the left is obstructed. The fireman sits on the other or left side, and Dean, the fireman, said that as the locomotive approached he saw the flashes of lights of the approaching automobile through the branches when it was 75 to 100 feet from the trades, and that when it was 50 or 60 feet from the tracks and the locomotive was 300 or 350 feet away, it could be clearly seen; that it was approaching the tracks and “wasn’t moving very fast,” and he didn’t think there would be an accident because the automobile was going slowly and that “at various times you have people that come close to the track and stop all of a sudden like.” As soon as he realized that the car would not stop, he called to the engineer who applied the brakes in emergency. His testimony was corroborated by the engineer.
It was shown that the train proceeded half a mile before it could be brought to a stop, and it is argued from this that the speed of the train was unduly excessive. It is conceded that the speed was 68 or 70 miles an hour, but in that particular locality and under the then existing conditions, we do not find this excessive. Ledet v. Texas and New Orleans Railroad Company, La.App., 79 So.2d 604.
The absence of the additional inverted “T” sign, which would have indicated that there were both a side track and a main line to be crossed, had no bearing on the accident.
It is conceded and the photographs show that there were facing Zeringue two signs plainly indicating that he was approaching a railroad. One of them was the very large cross boards which are universally recognized as indicating a railroad crossing and the other was a rather large and very noticeable circular metallic sign which also indicates that a track is being approached.
As a matter of fact, although the record does not definitely show that the highway on which the accident occurred was “contained in the maintenance system of the State Highway Department,” we think it is clear that it was. If it was, then the requirement of the inverted “T” sign had no *814 application here since the last paragraph of LSA-R.S. 45:562 provides that those requirements as to signs “[do] not apply to grade crossings of any roadway” maintained by the State Highway Department.
Noah Zeringue, the decedent’s brother, said that frequently he was on the same “shift” with his brother; that when he was, he rode with him; that they used that Highway, known as the Barton Road; that he was familiar with that particular crossing, and when asked whether his brother was as familiar with it, he said: “Yes, sir.”
The record convinces us that when Zer-ingue reached a point 30 or 40 feet from the first rail he could see to his right a distance of more than 1400 feet. Not only is there testimony to this effect, but a photograph taken on the next morning shows clearly that while there was a curve in the tracks, it did not start immediately at the crossing, and there is evidence to the effect that a man standing on the crossing could be seen by anyone 1400 feet toward Ze-ringue’s car, so that he could not have failed to be aware of the approach of the locomotive had he paid the slightest attention and taken the required precautions of looking and listening and having his car under such control as would have permitted his being able to stop.
There is one point which plaintiffs contend should be stressed and to which our attention has already been directed and that is the contention that to the right of Ze-ringue, as he neared the tracks, the trees to his right and the curve of the tracks in the direction from which the locomotive was approaching prevented his seeing the locomotive until it was very close to the crossing. As already shown, the evidence is convincing that for a distance of more than 1400 feet his view was unobstructed when he reached a point 30 or 40 feet from the side track and 50 or 60 feet from the main line, and it is interesting to note that though plaintiffs rely heavily on the fact that there was a curve in the track which is correct, Mr. Collier, the surveyor who made a sketch of the whole area, erroneously fails to show any such curve, for if we apply the scale of one inch to twenty feet to his sketch, we find that, according to it, he shows no curve for a distance of more than 200 feet.
As we have said, there are some disputed facts and while, if there were no other facts, we might have felt that the verdict of the jury should not be disturbed, we cannot escape the conclusion that the really important fact, which counsel for plaintiffs have carefully avoided stressing, is that the accident took place at night, at a crossing with which Zeringue was thoroughly familiar, and that on the locomotive there was a brilliant electric headlight.
Had the occurrence taken place in the daytime and had the view of Zeringue been blocked to any substantial extent, and had the warning signals of the approach of the train not been given, it would have been possible to hold that there was nothing sufficiently apparent to give notice to Zerin-gue, but that cannot be said concerning an accident occurring at night with the brilliant lights of the locomotive shining directly on the automobile approaching.
For the reasons assigned, the judgment appealed from is reversed and plaintiffs’ suit is dismissed at their cost.
Reversed.