On the night of August 14, 1941, between 11 and 12 o'clock, while plaintiff was returning from New Orleans to his home in Donaldsonville, the Packard automobile which he was driving stopped and stalled on the highway crossing over the *Page 79 
railroad track about a mile north of Burnside station in Ascension Parish. The automobile was struck by a passenger train going north, and the car was carried north for several hundred feet from the point of impact and completely demolished. In this suit plaintiff seeks to recover the sum of $1,417 from the defendant railroad as damages made up of the following items: value of the demolished car, $795; radio, $60; seat covers, $12; merchandise in the car destroyed in the wreck, $50; for personal injuries and shock sustained by him when he jumped out of the car on the approach of the train, bruising his leg on the gravel, the sum of $500.
Liability for the damage is sought to be placed on the railroad because of its failure to properly maintain the highway crossing, the roughness of the crossing causing plaintiff's car to stall on the railroad tracks; the failure of the train crew to keep a proper lookout, and their failure to see the stalled car on the track in time to stop the train before hitting the car; the excessive speed at which the train was being operated (alleged to be 80 miles per hour); and finally, the train crew had the "last clear chance" to avoid the accident after they saw, or should have seen, the car stalled on the track.
Several pleas and exceptions were filed, but all of these have passed out of the case, and it is not necessary to mention or discuss them. One defense urged by the railroad was that the train which struck the automobile did not belong to the defendant and was not being operated by its employees, however, in their briefs in this court, counsel for the defendant railroad company have abandoned that defense and have rested the defense solely on the merits. The railroad denies that its agents and employees were guilty of any negligence, and avers that the plaintiff was guilty of negligence in many respects, which negligence was the sole and proximate cause of the accident. Among the acts of negligence charged to plaintiff were his failure to stop, look and listen before going on the track at the crossing; his failure to make any effort to flag the train after his car stalled on the track; that he was driving a car which he knew to have a defective starter and which car was otherwise defective and unsafe.
The trial judge rendered a judgment in favor of the defendant, rejecting plaintiff's demands, and he has appealed.
There is no great difference in the evidence as to the facts. The motor of plaintiff's car went dead just as his car got on the track at the crossing. He made an effort to start the car but was unsuccessful in doing so. In a few moments he saw the glare of the headlights of the on-coming train from the south, whereupon he jumped out of the car and in attempting to get out of the way of the train, he claims that he scraped his right leg on the gravel, causing some bruises on it. The train struck the automobile almost broadside, carrying it up the track. South of the crossing there is a curve in the railroad track for a distance of some 450 feet, the curve turning to the right on approaching from the south.
We will take up in the order above mentioned the alleged acts of negligence on which the plaintiff seeks to place liability on the railroad company.
 Defective Crossing.
Section 691 of the Revised Statutes, as amended by Act No. 157 of 1910, requires railroads to construct and maintain their crossings over public highways so as not to hinder, impede or obstruct the safe and convenient use of the highway. According to the testimony of two or three railroad employees, as well as that of two or three parish officials who travel over this crossing daily, the crossing was in a reasonably good condition. The sheriff of the parish who frequently passes over this crossing in his car testified that it was in good condition, although the east rail is a little lower than the west rail on account of the curve in the track. A picture of the crossing taken shortly after the accident shows that the gravel covers the ties between the rails, and the only uneven part of the crossing is where the rails extend above the gravel, as indeed they must to permit the passage of trains over the crossing. We can see nothing in the condition of the crossing that should have caused a sufficient jolt or jar to interfere with the operation of an ordinary automobile. The railroad was only required to keep the crossing in a reasonably safe condition, and this we think was done. See Wallace v. Louisiana A.R. Co., La.App., 6 So.2d 63.
 Failure to Keep a Proper Lookout.
The engineer on the train testified that on a straight track the headlight on the *Page 80 
locomotive will reflect about one-half mile in front of the train, but in making this curve the headlight would not reveal an object on the crossing until the train was within 350 to 400 feet of it; that on approaching the crossing and as the train rounded the curve, he first saw a man standing in the highway in front of the stalled automobile, and immediately as his lights swung around with the movement of the train around the curve, he saw the car across the track at the crossing and applied his emergency brakes and brought the train to a stop as soon as possible after it had struck and carried the automobile for some distance up the track. He blew the whistle for the station at Burnside, and the whistle was sounding and the bell was ringing as he was rounding the curve for this highway crossing. He testified that he could stop the train at the speed he was traveling within a distance of 1500 to 1600 feet. The fireman was sitting in his cab on the left side of the locomotive and on the outside of the curve. He testified that he saw the man standing on the highway west of the crossing and then saw the stalled car on the crossing at a distance of from 250 to 300 feet; that the engineer blew the danger signal and applied the emergency brakes in an attempt to stop the train.
The evidence in the record shows a rather sharp curve in the track for a distance of some 450 feet south of the crossing, and it is easy to determine from the map and pictures of the track near the crossing that the beam of the headlight from the locomotive would not reflect on the crossing until the train was within 350 or 400 feet of the crossing, and it is obvious that the trainmen saw the stalled car on the track just as soon as it was possible for them to see it as the train came around the curve. Indeed, the plaintiff himself says that he first saw the headlight of the train when it was about 300 feet down the track coming around the curve.
Of course, if the track had been straight, the engineer, according to his own statement, should have seen the stalled car in ample time to stop the train, but, on account of the curve in the track, he saw the car just as soon as it was possible for him to see it. As we said in the recent case of Griffin v. Thompson,11 So.2d 114, in order to determine whether or not the operators of a railroad train were guilty of negligence in failing to see what they should have seen, the conditions existing at the time which would make it possible for the trainmen to see an object on the track in time to prevent striking it must be taken into consideration. We there held that a curve in the railroad track which prevented the beam of the headlight of the train from following the track, making it impossible for the engineer to see a person on the track for a sufficient distance to stop the train before striking him, did not require the trainmen to operate the train at such a speed that it could be stopped within the range of the headlights.
 Speed of the Train.
While the petition alleges that the train was going at a speed of about 80 miles per hour, the engineer testified that he was making 60 miles per hour, the speed which his schedule required him to make. There is nothing to contradict his statement as to the speed of the train. The evidence shows that the crossing is in an open country, consisting of plantations and open woods. The pictures in evidence show a considerable growth of weeds and underbrush for some distance around the crossing. The train was not required to stop at Burnside, almost a mile away, and it is well settled that a train is not required to slow down its speed for an ordinary crossing in the open country, as otherwise trains would never be able to make their schedule. In the open country, any speed consistent with the safety of the train is permissible. Davis et al. v. Alexandria W.R. Co., 152 La. 898, 94 So. 436; Winfiele v. Texas P. R Co., La.App., 150 So. 43.
 Last Clear Chance.
As already stated, the engineer saw the car on the crossing when he was within 350 to 400 feet of it. He was going 60 miles per hour and it took some 1600 feet to stop the train going at that speed, as is shown by his testimony as well as other testimony in the record. That he did all that could be done to stop the train is shown by the fact that it came to a stop from 1300 to 1400 feet beyond the crossing. Had he been going only 40 miles per hour, it would have required 1200 feet or so for him to stop the train and it is clear that he could not have avoided striking the automobile had he been going as slow as 25 or 30 miles per hour. *Page 81 
As there was no negligence shown on the part of the operators of the train, it is unnecessary to consider the acts of contributory negligence charged to the plaintiff.
Finding no error in the judgment appealed from, the same is hereby affirmed at the cost of the plaintiff in both courts.