Mrs. Phoebe A. WOOD

v.

ATLANTIC COAST LINE RAILROAD COMPANY.

James Dawson WOOD

v.

ATLANTIC COAST LINE RAILROAD COMPANY.

Civ. A. Nos. 489, 490.

United States District Court
M. D. Georgia,
Valdosta Division.

Aug. 10, 1960.

E. Way Highsmith, Highsmith, Highsmith, Alaimo & Knox, Brunswick, Ga., H. C. Eberhardt, Valdosta, Ga., for plaintiffs.

Alexander, Vann & Lilly, Thomasville, Ga., S. Spencer Bennet, Quitman, Ga., for defendant.

BOOTLE, District Judge.

These cases are now for decision upon motions for judgments notwithstanding the verdicts.

On February 2, 1958, at 1:30 o'clock a. m., the plaintiff Wood was driving his Cadillac automobile north on Ridge Avenue in the City of Tifton, Georgia. His wife, the other plaintiff, was sitting beside him as a guest passenger. Ridge Avenue runs in a general north and south direction, and is intersected by the defendant's tracks which run in a general east and west direction. This is a public crossing maintained by the railroad. As Wood approached the crossing he was traveling pretty well over on the left-hand side of the street, and he says he was probably over there to get off the bumps that were on the right-hand side of the road just before the crossing. Wood drove his car into the 38th rail-

road car behind 4 diesel engines of the railroad company's 101-car freight train which was moving across the crossing, the freight train consisting of a total of 105 units. Wood had lived in Tift County all of his life and in Tifton for 6 or 7 years or longer prior to the date of the collision, and was familiar with the crossing at which the collision occurred and with the street at the crossing. He testified that it is probable that he could have crossed that crossing 4 or 5 times a week in the year preceding the collision. During the evening of the collision Wood had been drinking beer and whiskey, 2 or 3 cans of beer, the last one around 9 o'clock, and a drink of whiskey between 9:30 and 10. Mrs. Wood, too, had had "about 3" cans of beer. The lights on the car were in good condition, but were on dim. Wood saw the train when he was between 75 and 100 feet from it. He said 70 or 75 feet on direct, but 75 to 100 on depositions and on cross. He was not familiar with the schedule of freight trains moving across the crossing. The train was traveling between 12 and 15 miles per hour. The engineer sounded the horn several times 1,200 or more feet before he got to the crossing. The bell was ringing and the horn being sounded. No cars were approaching when the train crossed the crossing.

The plaintiffs claim that the defendant was negligent in several respects in failing to maintain signal lights or gates at the crossing, in failing to illuminate the crossing and in permitting large quantities of sand to accumulate along the approach to the crossing making it difficult for plaintiff's car to obtain proper braking when Wood applied his brakes. The complaints, as amended, alleged that the tracks leading to the crossing from the west were obscured by a dense growth of high weeds which the defendant had allowed to grow along the right of way and that the tracks to the east of the crossing were completely obscured by a large building situated on the southeast corner of the crossing. And as amended the complaints allege also that at a point north of the crossing

Ridge Avenue goes up a hill so that the crossing lies close to the bottom of a valley, that the asphalt pavement is dark in color and blended in with the dark railroad cars, and that it was a dark night.

The complaints survived motions to dismiss and motions for summary judgment, the court being of the opinion that the evidence should be heard. They survived also motions for directed verdict, the court then being of the opinion that it would be advisable to see what the jury decided, this being an advisable practice as permitted by Rule 50(b), Fed.Rules Civ.Proc. 28 U.S.C.A.; Savannah Wholesale Company v. Continental Casualty Company, 5 Cir., 1960, 279 F.2d 706.

The following question and answer summarizes Mr. Wood's contentions:

"Q. Mr. Wood, state to the jury just why it was that if your lights were burning well and your brakes were in good order—you had good lights and good brakes—why you couldn't see those cars across the road in time to stop before sliding into them. A. Well, in approaching the crossing, approximately four hundred feet you start on a decline and at approximately—I wouldn't say exact how many feet, but just before you get to the crossing your decline ceases and you go up for just—the car raises up, and my lights being on dim and shining down, it would almost be impossible to see a train unless your lights hit it, due to the dullness and condition of the street, because of the fact that when you—approximately four hundred feet from the crossing if there was a train of flat cars you could almost see completely across over the train to the other side of the street."

Immediately ahead of the 38th car was a refrigerator car, a flat car and a box car. There were 5 or 6 Atlantic Coast Line covered hoppers ahead of car 38 and they had prismo reflective paint on them.

The following question and answer to and by Mr. Wood are significant:

"Q. Well, state whether or not, as you enter Third Street, the last street before you get to the Main Line, which is 475 away and you are 15, nearly 16 feet above the line, would it be possible—would that [prismo reflective] paint help you any if it is on one of these flat cars? A. It would be impossible, due to the fact that once you hit your— come into Third Street, you go down and it would naturally make your lights shine down and, therefore, you couldn't with dim lights on you couldn't see the paint on them."

■ The rule in Georgia requires that there be something unusual or extraordinary about the situation at the crossing before an automobile driver will be excused for not seeing, or, conversely, a railroad subjected to the duty of giving a warning of the presence of, a thing so obvious as a train occupying the crossing. It is a part of this rule that "no warning need be given of the presence of a thing plainly visible within the range of the statutory headlight requirements, to a person of prudence." Atlantic Coast Line Railroad Company v. Kammerer, 5 Cir., 1956, 239 F.2d 115, 117; Atlantic Coast Line Railroad Company v. Sapp., 5 Cir., 1957, 248 F.2d 889, 891. Judge Hutcheson expresses this rule this way: " * * * in a case presenting no special circumstances * * *." Atlanta & St. Andrews Bay Ry. Co. v. Church, 5 Cir., 1954, 212 F.2d 688, 691.

The real question in this case, therefore, is whether there are such special circumstances proved so as to prevent application of the rule that "one who drives headlong into a train standing [or, a fortiori, moving] across a highway cannot complain of negligence because no special warning of the presence of the train was given. This is so because the train itself standing starkly there is a warning." Atlanta & St. Andrews Bay Ry. Co. v. Church, supra; Atlantic Coast Line Railroad Company v. Sapp, supra; Atlantic Coast Line Railroad Company v. Kammerer, supra.

■■ If the driver of the car could have seen the train "within the range of the statutory headlight requirements" no recovery can be had. Atlantic Coast Line Railroad Company v. Kammerer, supra, 239 F.2d at page 117; Atlantic Coast Line Railroad Company v. Sapp, supra; Georgia Northern Ry. Co. v. Stains, 1953, 88 Ga.App. 6, 10, 75 S.E. 2d 833; Atlantic Coast Line R. Co. v. Marshall, 1953, 89 Ga.App. 740, 748, 81 S.E.2d 228, 231. These cases are obviously sound because it is the driver's duty to maintain a vigilant lookout ahead and if he sees, or could have seen, a train ahead of him within the range of his headlights or within the range of his statutory headlight requirements and negligently fails to see it no recovery can be had either by him or his guest passenger because his negligence is the sole proximate cause of the collision. In Atlantic Coast Line R. Co. v. Marshall, supra, the rule is stated:

"In order to establish liability in this case, it was necessary for the plaintiff [a guest passenger] to prove by competent testimony that the fog and smoke impaired the driver's visibility to such an extent that he did not have clear vision for 500 feet, otherwise the fog or smoke would not have been a material factor."

The cases upon which plaintiffs rely in which recovery has been permitted present such special and unusual circumstances as shadows from the moonlight, abandoned spur track, substantial open space in automobile's lane between standing box car and locomotive, as in Atlantic Coast Line Railroad Company v. Kammerer, supra; fog, highway 4 feet lower than track, highly constructed railroad car so that automobile lights went beneath it after motorist had stopped "as required by law", and train being left across street for more than 5 minutes in violation of city ordinance, as in Southern Railway Co. v. Lowry, 1938, 59 Ga.

App. 109, 200 S.E. 553, 554; cloudy and misty weather with railroad sign down as in Savannah & Atlanta Railway Company v. Newsome, 1954, 90 Ga.App. 390, 83 S.E.2d 80; foggy, misty, dark morning as in Central of Georgia Railway Co. v. Heard, 1927, 36 Ga.App. 332, 136 S.E. 533; driver of a heavily loaded truck unable to see or hear a box car "standing silently" across crossing with engine detached and driven to some distant point because truck was negotiating "a curve and a deep descent" as in Mann v. Central of Georgia Railway Company, 1931, 43 Ga.App. 708, 713, 160 S.E. 131, 133; motorist approaching crossing with which he was not familiar and absence of highway sign as required by Ga.Code Ann. § 94–511, down-grade curve, presence of shadows, dark colored box car blending with black pavement, inability to see standing train until within 180 feet of it and inability to stop because the new asphalt pavement was slippery, as in Padgett v. Central of Georgia Railway Company, 1957, 95 Ga.App. 96, 97, 96 S.E.2d 658, 660 (this was a demurrer ruling only and the court said: "[i]f the plaintiff could have stopped within the distance that the negligence of the defendant was or ought in the exercise of ordinary care to have been apparent to him, he cannot recover"); black coal car not over 3 feet high negligently left standing on crossing for an unreasonable length of time not visible to driver because lights not projected upon the low coal car, not over 3 feet high, until short distance from it and until the road " 'dipped sharply' toward the track", as in Rape v. Tennessee, Alabama & Georgia Railway, 1933, 47 Ga.App. 96, 169 S.E. 764, 765.

Texas and Pacific Railway Company v. Watkins, 5 Cir., 1957, 243 F.2d 171, is not a standing train case or a blocked crossing case. There the swiftly moving train approached the tractor driver somewhat from the rear.

Recognizing the necessity of showing special or unusual circumstances the plaintiffs here undertake to show that it was impossible to discern these freight cars because of the peculiar location of the crossing, it being dark and unlighted, and because of the dark hill in the foreground which blended into one mass with the train. Their inability to establish this impossibility is indicated by these references to the record. Dr. Hardwick testified that "they were most difficult to see", and that on May 24, 1959 he "did not see" a standing train on that crossing in time to stop and that at that time there was sand on the street and he skidded into the train. Chief Renew, when asked whether it was "impossible to tell that there was a train there", said: "it's hard to see one with that dark crossing", and that once since this collision he almost hit a train there. Wood testified positively, however, that with his dim lights on he actually saw this train when he was 75 to 100 feet from it. This was the far reach of the statutory headlight requirement for dim lights. Ga.Code Ann. § 68–1713(b). Under the physical facts including the photographs in evidence and the 2 surveyors' profile plats in evidence, there was no physical obstruction and nothing to prevent Wood's seeing the train at least 475 feet away if he had been using his bright lights which were admittedly good, and if they complied with the statutory requirement, Ga.Code Ann. § 68–1713(a). Certainly he should have been using his bright lights since he was familiar with the crossing and with the highway at that point even to the extent, under his testimony, of bearing to the left in order to avoid some bumps. These 2 profile plats show that there was no sudden rise or decline as Wood approached the crossing. From a distance of at least 475 feet from the main line there is a gradual decline all the way to the tracks. From Mr. Wood's testimony quoted above he was at least equivocal as to whether or not with bright lights on he could have seen the prismo reflective paint on some of these cars even from the top of the hill 475 feet back. The fact of far range visibility is not disputable in view of the absence of obstructions, the absence of any other traffic and the fact that this

was a straight road. No curves are involved, no sudden dips or descents, and no sudden elevations. Plaintiff's witness, Dr. Hardwick, said: "as you approach the crossing you are going down hill at an angle, and of course your lights are down hill as well. The crossing then becomes more or less flattened out and the cars up above it." Actually, the profile plats show no flattening out—only a continuing decline. Dark colored railroad cars are more susceptible to vision and light reflection on a dark night than would otherwise have been true. Burnett v. Louisville & Nashville Railroad Company, 1938, 58 Ga.App. 64, 66, 197 S.E. 663. If there had been a street light close by nearer than those variously estimated at from 210 feet to 510 feet away it might have caused the car lights "to blur" as in Pollard v. Clifton, 1940, 62 Ga.App. 573, 9 S.E.2d 782. No blurring of lights is alleged, and among the 37 cars which followed the 4 diesel engines over the crossing just ahead of the 38th car into which plaintiffs' vehicle was driven there were the 5 or 6 Atlantic Coast Line covered hoppers, portions of which were painted with the prismo reflective paint.

The charge of negligence with respect to sand accumulation is not borne out by the proofs. Dr. Hardwick testified to the presence of sand on May 24, 1959, more than a year after this collision. Neither of the plaintiffs testified that any sand was present at the time of the collision. Mr. Wood testified that sand is on the crossing most of the time, and that the picture taken March 8, 1960 shows light traces of sand. He testified that he saw sand on the street more than 5 months after the collision. Chief Renew testified that he saw sand on the street on the day following the collision and that there is usually sand there. There was testimony by defense witnesses that they examined the crossing shortly following the collision and that there was no sand on the crossing nor on the approaches to the crossing which would have affected Mr. Wood's ability to stop. There was no evidence that the sand which Chief Renew saw on the following day did not accumulate subsequent to the collision. Nor is there any testimony as to the quantity of sand present at any time except as to the "light traces" shown in the picture. Nor is there any evidence that the railroad put the sand there, or knew that it was there, or that it had been there long enough to charge the railroad with its presence. Under statutes of the type of Ga.Code Ann. §§ 94–503 and 94–504, the "railroad was only required to keep the crossing in a reasonably safe condition, and this we think was done", Bahry v. Illinois Central Railroad Company, La.App.1943, 13 So.2d 78, 79, and

"[t]o recover for negligent maintenance of a crossing it must be alleged and proved that the defendant either had actual or constructive notice of the defect within time to make repairs before the time of an accident alleged to have been occasioned thereby." Liddle v. Thompson, 236 Mo.App. 1071, 1080, 162 S.W.2d 614, 619(5).

No special circumstances have been shown to take these two cases out of the general standing or moving train rule. A moving train blocking a crossing tends to attract attention and is even a grimmer warning than a standing train. It is not negligence to stop a train across a highway when necessary for a reasonable length of time. Driskell v. Powell, 5 Cir., 1933, 67 F.2d 484; Mann v. Central of Georgia Railway Company, supra. Trains may lawfully cross roads and streets just as motorists may cross railroad tracks with their vehicles. Atlantic Coast Line Railroad Company v. Sapp, supra.

Here, we obviously had "the clattering and other noises, [of] a moving train" heard by Judge Bell in Mann v. Central of Georgia Ry. Co., supra, 43 Ga.App. at page 714, 160 S.E. at page 134 accompanied by "its bell ringing and its headlight flaring" also perceived by him. We also had the horn blowing 1,200 feet before the crossing and when the crossing was reached and crossed, and this was

not a Pullman train with its smooth uniform lines; it was a rumbling freight train with broken, irregular contour. While its consist was not detailed in the evidence, it was given in interrogatory answer No. 24. The engine was composed of four diesel electric units, and these four units were pulling 101 freight cars as follows: "1 caboose, 15 refrigerators, 39 box cars, 18 gondolas, 5 pulpwood flats, 1 regular flat, 4 tank cars, 13 open top hoppers, 5 covered hoppers." As disclosed by interrogatory answer No. 26, there were 6 flat cars in the train all ahead of the 38th, or collision, car, and these 6 flat cars were spaced as follows: 3rd car from engine, pulpwood flat loaded with pulpwood; 4th car from engine, pulpwood flat loaded with pulpwood; 5th car from engine, pulpwood flat loaded with pulpwood; 6th car from engine, pulpwood flat loaded with pulpwood; 7th car from engine, pulpwood flat loaded with pulpwood; and 36th car from engine (2 cars ahead of the collision car), flat car loaded with tractors. From interrogatory answer No. 31 it appears that the cars ahead of the collision car which were painted with prismo reflective paint are as follows: 6th car ahead, 8th car ahead, 9th car ahead and 12th car ahead, the sills of said cars for the full length of the cars and the end sills being painted with prismo reflective paint. While the detailed make-up of the train above listed did not appear fully in the evidence but only from answers to interrogatories, the evidence did disclose as hereinabove pointed out that immediately ahead of the 38th car was a refrigerator car, a flat car and box car, and there were 5 or 6 Atlantic Coast Line covered hoppers ahead of the collision car, and they had prismo reflective paint on them.

The instant cases are controlled by the following cases: Burnett v. Louisville & Nashville Railroad Company, supra, where it was held that plaintiff was barred by his own negligence as a matter of law; Pollard v. Clifton, supra, where it was held that plaintiff was barred by the doctrine of last clear chance; Atlantic Coast Line R. Co. v. Marshall, supra [89 Ga.App. 740, 81 S.E. 2d 232], holding that a guest passenger could not recover "[s]ince the evidence was insufficient to authorize a finding that the defendants were negligent in failing to warn the public of the presence of the train or the crossing in some manner other than that of the train itself * * *" that is, no negligence on the part of the railroad; Smith v. Southern Ry. Co., 5 Cir., 1931, 53 F.2d 186, holding that plaintiff was barred by his own negligence and by last clear chance doctrine; Brown v. Southern Ry. Co., 5 Cir., 1932, 61 F.2d 399, 400, holding that guest passenger could not recover because "there is no doubt that the negligence of the driver was the proximate cause of the accident and therefore the passenger could not recover"; Central of Georgia Railway Co. v. Adams, 1929, 39 Ga.App. 577, 581, 147 S.E. 802, holding that plaintiff was the author of his own misfortune and that the acts of negligence alleged against the defendant did not contribute to, or concur with, plaintiff's negligence in causing the collision; Atlantic Coast Line Railroad Company v. Sapp, supra, 248 F.2d 890, holding in a well reasoned opinion by Judge Borah that where a motorist in a midnight accident crashes into the 83rd car of a moving freight train blocking a crossing he cannot recover despite foggy conditions, the fact that there were no automatic signals, no employee stationed there to flag or warn motorists, no fusees put out in accordance with the railroad's alleged custom, the fact that a motorist approaching the crossing would have his view of an approaching train "obstructed by an embankment, deep underbrush, and trees", it being "equally clear from the testimony that these physical conditions which existed on defendant's right of way would not prevent a motorist's seeing a moving freight train on the crossing directly in front of him and across the highway he was traveling." The court said:

"In the instant case the only fact relied on by appellees to impose the

additional duty on the part of the railroad to provide a special warning was the alleged presence *of fog* at the crossing. And to establish liability it was *necessary* for appellees to prove that the fog was of such density that it impaired the automobile driver's visibility to such an extent that he in the exercise of ordinary care for his own safety could not have seen the train on the crossing in sufficient time to avoid striking it. This they wholly failed to do." (Emphasis supplied.)

In the case at bar we do not even have the fog, much less the fog with the density prescribed by the Sapp case. All we have here is a dark night, an unlighted crossing, the absence of a watchman, with a dark continuation of the straight road turning upgrade a little distance beyond the crossing and an unproven amount of dry sand which may or may not have been there on this particular occasion, and if it was there the absence of any evidence as to how long it had been there or that the defendant put it there, or knew that it was there, unless it could be said that from the testimony that an unspecified amount of sand was usually there the railroad should be charged with knowledge. Judge Borah concluded at page 891, of 248 F.2d that the evidence "wholly failed to show that the railroad company was guilty of any act of negligence the result of which caused" the collision.

In Driskell v. Powell, supra, 67 F.2d 485, Judge Sibley stated that a guest passenger's suit against a railroad states no cause of action by alleging collision with a standing freight train at an unfamiliar crossing down in a hollow hidden by fog with absence of warning by sound, lights or watchman, it not being "alleged how long the train had been standing or that the stopping of it was not necessary; nor how long the densely foggy condition had existed there."

Evans v. Georgia Northern Railroad Company, 1949, 78 Ga.App. 709, 52 S.E. 2d 28, 29, holds that a guest passenger was not entitled to recover because as a matter of law the sole proximate cause of the collision was the negligence of the driver of the car and that "while ordinarily questions of diligence and negligence, including proximate cause, are for the jury, it is the duty of the court to determine these questions in clear and palpable cases."

Georgia Northern Ry. Co. v. Stains, supra, 88 Ga.App. at page 12, holds that negligence of plaintiff's host was the proximate cause of plaintiff's injuries and that the negligence of defendant, if any, neither contributed to nor concurred with the driver's negligence in causing the injuries to the guest passenger plaintiff.

Here we have a straightaway road with no obstruction to view to which the standing train doctrine normally applies. Moreover, we have not a silent standing train, but a noisy moving train. We have none of the special circumstances usually relied upon as creating exceptions to the rule. We have a driver fully familiar with the crossing. With the driver's good lights unquestionably he could have seen this train in time to stop if he were looking and his speed not excessive. The Act of 1953, Ga.Code Ann. § 68–1661, required that he stop his vehicle within 50 feet but not less than 15 feet from the nearest rail at this crossing and not proceed until he could safely do so, the approaching train being plainly visible and in hazardous proximity to the crossing.

The length of this memorandum is due not to the complexity of the problem but to the natural reluctance to upset the verdict of a jury.

In both cases judgments notwithstanding the verdict must be granted because: (1) no negligence has been proved against the railroad; (2) if any negligence has been established against the railroad it did not cause this collision or contribute in causing it, or concur with Mr. Wood's negligence in causing it; (3) the negligence of Mr. Wood was the sole proximate cause of this collision.

As to Mr. Wood's case judgment notwithstanding the verdict must be granted for the additional reasons: (1) his negligence exceeded the negligence, if any, of the railroad; (2) he, by the exercise of ordinary care, could have avoided the consequence of defendant's negligence, if any exists, after he knew of it, or, in the exercise of ordinary care, should have known of it.

Let defendant's counsel prepare appropriate orders and submit them to the court, after giving plaintiffs' counsel 5 days for suggestions as to form.